552 So.2d 264 (1989)
Johnny Lacey THOMPSON, Appellant,
v.
STATE of Florida, Appellee.
No. 88-02910.
District Court of Appeal of Florida, Second District.
November 8, 1989.
James Marion Moorman, Public Defender, and Julius J. Aulisio, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Peggy A. Quince, Asst. Atty. Gen., Tampa, for appellee.
LEHAN, Judge.
Defendant appeals from his convictions for aggravated battery and aggravated assault. The convictions stemmed from an incident in which defendant twice shot Edward Clifton. One of the contentions on appeal is that the trial court erred in failing to grant defendant's motion for a judgment of acquittal because the state failed to rebut his prima facie case of self-defense. That defense included evidence that it would have been futile for defendant to have retreated from an attack by Clifton, instead of having defended himself. Because, as we will explain, that defense was not rebutted by any evidence or any reasonable inference from the evidence and was, in fact, supported by some of the state's evidence, we reverse the foregoing convictions.
At trial, Clifton, his friends Gable and Williams, and defendant testified. Defendant's friend Roop, whom Clifton was beating when defendant entered upon the scene, did not. Roop is a defendant in a different but related case. While in a number of respects the testimony conflicted, the determinative facts, which we will undertake to summarize, are not in dispute.
Clifton and Roop apparently had had their differences over Peggy Hansen, whom the two had dated at different times. On the day of the incident, Roop and Clifton had agreed to meet in a park across from Hansen's residence to resolve their differences. Defendant followed Roop to Hansen's residence but did not initially go over to the park where Clifton and Roop met. Defendant was carrying a gun in his pocket.[*]
Williams and Gable had accompanied Clifton to Hansen's residence, but, like defendant, they did not initially go over to the park. Clifton and Williams were both armed with nunchakus. Nunchakus are deadly weapons. R.V. v. State, 497 So.2d 912 (Fla. 3d DCA 1986), review denied, 508 So.2d 15 (1987). See also Robinson v. *265 State, 547 So.2d 321, 323 (Fla. 5th DCA 1989) (citing R.V.).
Initially, defendant, Williams, and Gable stood around outside Hansen's residence talking about Clifton and Roop. When the three then noticed that Clifton and Roop had begun fighting and that Clifton was beating Roop severely, they ran across the street to try to break up the fight. Defendant, who testified he is a slow runner, arrived last. According to defendant, Roop's face was "just a puddle of blood." Williams testified that Roop was "laying down ... with his arms flat and he was just getting pounded. He wasn't able to fight back... ." Clifton, Gable, and Williams all testified that Clifton was beating Roop with his bare hands, whereas defendant testified that Clifton was using nunchakus. In any event, it is not disputed that Clifton had nunchakus on his person and was beating Roop severely.
Williams and Gable unsuccessfully attempted to stop the fight and then backed away. Clifton appeared to be in a rage. Defendant then attempted to intervene, but Clifton, turning to defendant and saying words like, "You want some of me too?," began attacking defendant. Clifton's testimony, as well as that of defendant, was to this effect. As a result of the ensuing scuffle between Clifton and defendant, defendant's shirt became soiled with blood, apparently that of Roop, which was on Clifton. Defendant then, evidently while backing up, displayed his gun, not intending, according to his testimony, to shoot Clifton and hoping that merely displaying the gun would persuade Clifton to back off. But Clifton kept advancing on defendant. Thereupon defendant intentionally shot Clifton in the ankle in a further effort to stop him. This also failed to deter Clifton, who admitted that he said, "That's not good enough, nigger." Thereafter, while Clifton was within three feet of defendant, defendant shot Clifton above one of his eyes. Defendant's testimony was that he had aimed for Clifton's ear. The bullet exited to the side and did not penetrate the skull. Defendant waved off Williams and Gable with his gun, left the scene, and, after hearing that the police were looking for him, reported the incident to the police the next day.
While the testimony conflicted over whether Clifton was wielding the nunchakus when he turned on defendant, it is not disputed that Clifton was at least initially armed with them. In any event, there is no dispute that Clifton was the aggressor and that defendant was trying to defend himself after attempting to break up a fight in which his friend was receiving a severe beating.
When during defendant's testimony defense counsel asked defendant why defendant did not try to run away after being unsuccessful in deterring Clifton by displaying the gun, defendant testified that retreat would have been futile: "[I]t's obvious that I don't run too fast, because I was the last one getting down there [to try to stop the fight between Clifton and Roop]. And those guys ... were bigger than me, you know. I knew if I tried to run they would probably catch me and beat me in the back of the head with these sticks." Williams' testimony agreed with that of defendant that Williams, Gable and defendant had run to the scene of the fight from Hansen's house and that Williams had arrived before defendant. In fact, Williams testified that he was a fast runner and that he "beat everyone else, quite easily, down there."
As indicated above, both Gable and Williams were friends of Clifton, and Williams was also armed with nunchakus. It may be noted that defendant was the only black among whites. Also, defendant's unrebutted testimony established a particular reason for him to avoid physical injury: he could see with only one eye, and the condition of that eye, which had been subjected to surgery, was such that a blow to it could have caused permanent, total blindness.
Florida law recognizes that the use of deadly force may be justifiable under certain circumstances. Section 782.02, Florida Statutes (1987), provides: "The use of deadly force is justifiable when a person is resisting any attempt to murder such *266 person or to commit any felony upon him... ." See also Ramos v. State, 496 So.2d 837 (Fla. 2d DCA 1986); Fla.Std.Jury Instr. (Crim.) 3.04(d). There is a duty to retreat in the face of a felonious attack before using deadly force on the attacker, Baker v. State, 506 So.2d 1056, 1058 (Fla. 2d DCA), review denied, 515 So.2d 229 (1987) (quoting Cannon v. State, 464 So.2d 149, 150 (Fla. 5th DCA 1985)), but deadly force is justifiable if retreat would be futile, Brown v. State, 454 So.2d 596 (Fla. 5th DCA 1984).
Though it is axiomatic that an appellate court is not entitled to reweigh sufficient evidence, see Tibbs v. State, 397 So.2d 1120 (Fla. 1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); Tsavaris v. NCNB National Bank of Florida, 497 So.2d 1338 (Fla. 2d DCA 1986), it is also axiomatic that the state "has the burden of proving guilt beyond a reasonable doubt, which includes [when defendant has established a prima facie case of self-defense] proving beyond a reasonable doubt that the defendant did not act in self-defense." Ramos, 496 So.2d at 838. See also Brown. In Ramos, as in this case, "the state's evidence was legally insufficient to prove guilt beyond a reasonable doubt, because the state failed to rebut the defendant's direct testimony that he acted in self-defense and, in fact, some of the state's evidence corroborated defendant's testimony of self-defense." 496 So.2d at 838.
The record reflects no evidence to support the jury's necessarily implicit finding that defendant could have retreated from the scene and avoided the use of deadly force in defending himself. Indeed, Williams, a state witness, supported the defense in testifying that initially defendant backed up when Clifton was going after him and in testifying, as noted above, to the effect that Williams, who was armed with nunchakus, was a faster runner than defendant. While the testimony of Clifton and Gable did not reflect an initial effort on defendant's part to retreat, neither did that testimony in any way rebut the evidence that defendant tried to retreat or that retreat would have been futile. Thus, defendant's testimony regarding self-defense and retreat was not rebutted by any evidence or any reasonable inference from the evidence and, in fact, was supported by state evidence. Accordingly, that testimony could not properly be ignored. See State v. Bobbitt, 389 So.2d 1094, 1098 (Fla. 1st DCA 1980), reversed on other grounds, 415 So.2d 724 (1982); Diaz v. State, 387 So.2d 978 (Fla. 3d DCA 1980), review denied, 397 So.2d 779 (1981).
The determinative facts in this case are similar to those in Brown and Ramos, in which it was held that self-defense had been established as a matter of law. In Brown, the victim-assailant pursued the defendant "relentlessly." The defendant "did what he could to extricate himself from the situation... . The evidence is clear that defendant fired the second and fatal shot because there was no alternative, because [the assailant] had closed in on him and had defendant turned to run, [the assailant] would have been on him." 454 So.2d at 599-600. In Ramos, the defendant's shooting of a knife-wielding attacker had been justified because defendant "did not want to fight and tried to leave but was prevented from doing so by the victim's friends... ." 496 So.2d at 838. The case at hand encompasses both the relentless attacker situation exemplified by Brown and the situation involving a defendant being outnumbered by the victim's allies exemplified by Ramos. See also Rodriguez v. State, 550 So.2d 81 (Fla. 3d DCA 1989) (trial court should have granted defendant's motion for directed verdict when evidence showed that defendant had done all she reasonably could have done to avoid attack before she fatally stabbed her attacker).
Baker, cited by the state, is readily distinguishable. In that case it was clear that the defendant could have avoided defending himself by retreating from the scene. 506 So.2d at 1058. The evidence was unrebutted in this case that defendant was entitled to believe he could not have done so.
Defendant's convictions for aggravated assault and aggravated battery are reversed. The cause is remanded for resentencing *267 on his conviction for carrying a concealed firearm.
DANAHY, A.C.J., and FRANK, J., concur.
NOTES
[*] Defendant's explanation for carrying the gun was as follows. Defendant had planned to go fishing later in the day, and he always carried his gun with him due to his fear of snakes. Initially the gun was in his car, but when he stopped by a convenience store on the way to Hansen's residence, he transferred the gun to his pants pocket because his car door would not lock. The gun apparently remained there until the incident in question. Defendant does not appeal his conviction for carrying a concealed firearm in violation of section 790.01(2), Florida Statutes (1987).