COBB, Judge.
K.L.T., a minor, was adjudicated delinquent for commission of manslaughter, the charge originally having been second degree murder. The issue on appeal is whether the trial court erred in denying her motion for acquittal at the conclusion of the state’s case in the face of evidence adduced by state witnesses relating to self-defense. In accordance with our prior opinion in Brown v. State, 454 So.2d 596 (Fla. 5th DCA 1984), we hold that self-defense was not negated by the state’s evidence, and reverse. In Brown we stated:
[Wjhen the state fails to carry its burden of proof or where the state’s evidence clearly shows that a homicide was committed in self-defense, courts of this state have not hesitated to reverse jury convictions and to discharge the wrongfully convicted defendant. While the defendant may have the burden of going forward with evidence of self-defense, the burden of proving guilt beyond a reasonable doubt never shifts from the state, and this standard broadly includes the requirement that the state prove that the defendant did not act in self-defense beyond a reasonable doubt. [Citations omitted.]
Brown v. State at 598. In the instant case the state presented the testimony of four eyewitnesses to the killing. It was established by the state’s case that K.L.T. was fourteen years old at the time and living with a seventeen year old woman named Johnnie Daniels, who went by the name of Daphne. Daphne lived in a house rented for her and her infant child by her boyfriend, Allison (Twan) Mells, the infant’s father. Mells was also involved with one Erica Young, the homicide victim. Young *339 was the leader of a gang called the Shock-ettes known for “drinking and jumping on people,” and whose propensity for violence was candidly admitted by the state.[1] Erica had beaten K.L.T. with brass knuckles some three weeks before the killing, sending K.L.T. to the hospital for stitches, an injured eye, and a broken nose. Erica had also beaten K.L.T’s sister with brass knuckles. She had also engaged in a pistol whipping and stabbing. It was known in the community that she “liked to beat up on people.” It was also known that K.L.T. was afraid of Erica. Although K.L.T. had tried to avoid Erica after the beating, the latter had pursued her, pushed her around, harassed her, and tried to run over her with a ear; at one point, Erica drove by the house where K.L.T. lived and fired a shot into it. K.L.T. had reported these incidents to the police and the state attorney’s office, but to no avail.
At about 2:00 a.m. on the day of the killing, Erica Young and Carolyn Farmer (Twan’s mother), arrived at Daphne’s house, and Young said they had come to “put these bitches out like Twan told us to.” Young was loud, drunk and threatening. She got into a “cussing” match with Daphne, at which point the latter picked up the phone to call her sister to come and pick her up. At this point, Erica reached into her blouse (where she was known to carry brass knuckles) and walked toward Daphne. Daphne ran into her bedroom and Erica then went into the kitchen and got a steak knife. Upon seeing Young coming out of the kitchen with the knife, Daphne and K.L.T. ran from the house.[2] Daphne went to the rear of a car parked immediately by the front porch of the house, and picked up a gun out of the trunk. The car was parked some three feet from the front steps. Erica stood in the front doorway with a knife in her left hand and a vase in her right hand, and said: “You go ahead and get your little gun cause I’m gonna kill you both.” Daphne dropped the gun back in the trunk of the car, and then K.L.T., standing beside her, said, “Give it to me, she’s going to kill us both.” K.L.T. picked up the gun and fired one apparently accidental shot into the ground, then took a step or two forward, pointed the gun toward the house where Erica and others were standing, and fired one shot, killing Erica. K.L.T. and Erica were some eight or nine feet apart at that time. Based on Erica’s conduct at the scene immediately prior to the shooting, one state witness opined that Erica would have killed Daphne had K.L.T. not shot her; another said that Erica would have killed K.L.T., either then or later. The latter witness testified that when Erica had a weapon, “she’s gonna use it.” Both Daphne and K.L.T. fled the scene when Farmer went for her purse to get out her .357 magnum, which was loaded and operable.
We agree with the argument presented in the appellant’s brief:
At trial, many of the prosecution’s questions concerned whether or not (K.L.T.) could have safely run away rather than obtain a gun and defend herself. This question is misplaced because evidence showed that (K.L.T.) was attacked in her own residence. One of the exceptions to the general duty to retreat from attack applies when a person is attacked in her own home. Cannon v. State, 464 So.2d 149 (Fla. 5th DCA 1985). (K.L.T.) had often avoided or run away from Erica Young. She had no duty to do so when Erica came to her home with the stated intent to, “throw the bitches out.” Erica Young was armed and most certainly dangerous. (K.L.T.) had no duty to retreat, nor did she have any obli *340 gation .to wait for Erica to once again attack her.
In order for the defense of self-defense to prevail, the situation must have been such as to induce a reasonably prudent person to believe that danger was imminent and that there was a real necessity for the taking of a life. Gil v. State, 266 So.2d 43 (Fla. 3rd DCA 1972), cert. denied, 271 So.2d 139 (Fla.1972). In view of Erica Young’s known violent propensity and in view of her actual previous attacks on Appellant, only one conclusion is possible. (K.L.T.’s) action was the reasonable response of a frightened fourteen year old girl.
In Danford v. State, 53 Fla. 4, 43 So. 593 (1907), the Florida Supreme Court, citing to an earlier United States Supreme Court case,[3] stated that “a man violently assaulted in his own house is not obliged to retreat, but may stand his ground and use such force as may appear to him as a cautious and prudent man to be necessary to save his life or to save himself from great bodily harm.” See also Pell v. State, 97 Fla. 650, 122 So. 110 (1929). That statement is still good law today.
In conclusion, we simply observe that if the state cannot protect its children from the brutality of society’s predators, at least it should not punish them for protecting themselves.
REVERSED.
W. SHARP, J., concurs.
HARRIS, J., dissents with opinion.

. With admirable candor, the trial prosecutor stated: "[T]his Erica Young individual was as bad as I, frankly, have ever seen as an adult victim.”

. The state’s brief asserts that Erica Young armed herself with the knife only after K.L.T. and Daphne had left the house (hence no evidence of any attack by Young within the home). To the contrary, the state's eyewitness, Monique Poole, who was spending the night with Daphne and K.L.T. and was present throughout the incident, unequivocally testified on redirect examination by the state that Erica Young came out of the kitchen with a knife while Daphne was still in the bedroom. When Daphne came out and saw Young with a knife, she then ran out the front door, followed immediately by K.L.T.

. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).